## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | Criminal No. 13-705 |
| **DANIEL GATSON**, *et al.* | **OPINION** |
| **Defendants.** | |

This matter comes before the Court on Defendant Daniel Gatson's pretrial Omnibus Motion, including several supplementary requests filed by Gatson *pro se*. As discussed in more detail below, the Court partially grants and partially denies Gatson's motion.

## I.   Background

Because the Court writes this Opinion for the benefit of the parties only, it need not and will not describe the factual and procedural background of this case at much length.  On July 17, 2014, the Grand Jury in and for the District of New Jersey charged Gatson in the Fourteen-Count Second Superseding Indictment (the "SSI") with conspiracy to transport and receive stolen property, in violation of 18 U.S.C. § 371, and interstate transport of stolen property, in violation of 18 U.S.C. §§ 2, 2314.

On August 19, 2014, Gatson filed a pretrial Omnibus Motion seeking various forms of relief.  The Government filed its Opposition Brief to Gatson's pretrial motions on September 12, 2014.  Shortly thereafter, Gatson requested to release his attorney and proceed *pro se*.  On September 24, 2014, the Court granted his request.  On October 20, 2014, Gatson submitted to the Court two additional memorandums of law:  (1) a Reply Brief to the Government's Opposition Brief and (2) a Pro Se Brief, which each contained supplementary requests.  On October 31, 2014, Gatson filed a letter brief seeking to amend his previous Pro Se Brief ("Amended Pro Se Brief").  Finally, at a hearing before this Court on November 24, 2014, Gatson submitted a second amendment to his Pro Se Brief ("Second

Amended Pro Se Brief"). Gatson's Amended Pro Se Brief and Second Amended Pro Se Brief also contain supplementary requests.

The Court recognizes that Gatson's supplementary requests are out-of-time, but will nevertheless exercise its discretion to consider them on the merits. The Court will thus discuss both Gatson's original Omnibus Motion and his supplementary requests issue-by-issue below.

## II.   Legal Analysis

### A. Dismissal of the SSI

Gatson moves to dismiss the entire SSI under Federal Rule of Criminal Procedure 12(b)(3)(B). In analyzing a motion to dismiss under Rule 12, the Court must accept as true the facts as alleged and determine if those facts constitute a violation of the law under which the defendant is charged. *United States v. Zauber*, 857 F.2d 137, 144 (3d Cir. 1988). In assessing an indictment's sufficiency, the Court looks to whether it: (1) contains the elements of the offense charged, (2) sufficiently informs the defendant of the charge against which he must defend, and (3) enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). Generally, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989).

Here, the SSI comprises twenty-seven pages and fourteen counts. Twelve pages of text are devoted to describing the conspiracy alone. Fifty-three specific overt acts are described in detail. The substantive counts also spell out specific acts, identifying with particularity the dates the homes were burglarized, the municipality where each burglary occurred, and the dates that the stolen property was transported across state lines. Additionally, the conspiracy count sets forth the approximate monetary amounts of the cash, property, and jewelry stolen. The elements of the crimes alleged are fully stated in the charging language in each count.

Gatson seems to admit that the conspiracy charge in Count One of the SSI properly tracks the relevant statutory language, but he claims that it "is notably

barren with specifics." Gatson Br. 4, ECF No. 68-1. He further suggests that the overt acts listed in furtherance of the conspiracy "lack essential facts." Gatson contends that while the conspiracy count describes that Gatson transported the stolen property over state lines, it fails to articulate the specific property that was transported or its estimated value. To the contrary, the SSI, which contains language tracking the relevant statute, as well as specific allegations of criminal activity, is "entirely sufficient." *See, e.g., United States v. Olatunji*, 872 F.2d 1161, 1168 (3d Cir. 1989). The Government has no obligation to set out in the SSI every detail regarding the stolen property, its value, or the method in which it was transported across state lines. Rather, "[i]n order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating." *United States v. Hedaithy*, 392 F.3d 580, 589 (3d Cir. 2004) (internal citation omitted); *accord United States v. Agostino*, 132 F.3d 1183, 1189 (7th Cir. 1997) ("Indictments need not exhaustively recount the facts surrounding the crime's commission.").

Similarly, Gatson argues that Counts Two through Fourteen, which charge Gatson with interstate transportation of stolen property, are defective because they fail to specify the property stolen or the general value of that property. But Gatson has received voluminous discovery detailing these specifics. *See* Decl. of Assistant U.S. Attorney Josh Hafetz dated Sept. 12, 2014 ("First Hafetz Decl.") Ex. A, ECF No 70.1. Thus, by simply reading the discovery corresponding to each count of the SSI, Gatson has notice of the property stolen and its estimated value. Additionally, by cross-referencing the facts contained in the substantive counts with its corresponding conspiracy charge, Gatson can determine the approximate value of the property.

Further, defendants are not entitled to demand precise details about the evidence the Government anticipates will be presented at trial or the prosecution's theory of elements such as intent or knowledge. *See United States v. Moyer*, 674 F.3d 192, 203 (3d Cir. 2012) ("Rule 7(c) of the Federal Rules of Criminal Procedure . . . does not require the indictment to include every fact to be alleged by the government.") "The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981). Accordingly, courts have rejected similar allegations of impermissible "vagueness" or lack of notice on the ground that the Government is entitled to charge crimes such as conspiracy without listing every transaction as overt acts. *See, e.g., United States v. Janati*, 374 F.3d 263, 271 (4th Cir. 2004); *see also United States v. Urban*, 404 F.3d 754, 771 (3d

Cir. 2004) (Hobbs Act indictment sufficiently tracked language of statute and listed sources and approximate amounts of extorted payments).

Lastly, the SSI does not present any future double-jeopardy concerns. An indictment must contain only "enough detail that [the defendant] may plead double jeopardy based on the same set of events." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001). "Traditionally, courts have been understandably reluctant to interfere and require more particularity on potential double jeopardy grounds; it is a most difficult task to look ahead down the road and predict what future crimes may be charged by a subsequent indictment." *United States v. Stricklin*, 591 F.2d 1112, 1118-19 (5th Cir. 1979). Generally, the more detailed the indictment, the less concern with leaving the defendant open to future prosecution arising out of the same events. *Id.* Here, the Court finds that the SSI is sufficiently detailed to enable Gatson to plead an acquittal or conviction in bar of future prosecutions for the same offense.

In his supplementary motions, Gatson advances three additional grounds for dismissing the SSI. First, Gatson argues that the prosecutor "substantially influenced the grand jury's decision by repeatedly interjecting comments that were improper, not relevant and highly prejudicial." Pro Se Br. 63, ECF No. 77-1. This argument fails because Gatson has not provided examples of any improper comments made by the prosecutor in this case. *See United States v. Hintzman*, 806 F.2d 840, 843 (8th Cir. 1986) (holding that unsupported allegations of misconduct before the grand jury were insufficient, as "grand jury proceedings are afforded a strong presumption of regularity, and a defendant seeking to overcome that presumption faces a heavy burden"). Second, Gatson argues that "the discovery the United States disclosed is confusing" and "prevents [him] from understanding the specific evidence that points to each Defendant's personal involvement in the alleged conspiracy." Pro Se Br. 67-68. This argument is also unavailing. The Government is under no obligation to organize the discovery for Gatson. Further, the Court reminds Gatson that when he elected to proceed *pro se*, he was advised and acknowledged an understanding that he was undertaking responsibilities that might have been easier for a lawyer to perform.

Third, Gatson argues that evidence derived from the state wiretap authorization obtained by the Bergan County Prosecutor's Office ("BCPO") was presented to a federal grand jury in violation of 18 U.S.C. § 2517(5). Am. Pro Se Br. 78, ECF No. 80. Specifically, Gatson argues that the evidence from the state authorization, which only referenced crimes under New Jersey state law, could not

4

be presented to a grand jury investigating violations of 18 U.S.C. § 371 (conspiracy to transport and receive stolen property) and 18 U.S.C. §§ 2, 2314 (interstate transport of stolen property). The Court disagrees. The wiretapped cell phones and audio listening device used in this case did not involve a situation where the conversations intercepted through the wiretap were related "to offenses other than those specified in the order of authorization or approval." 18 U.S.C. § 2517(5). The intercepted communications directly relate to the crimes specified in the wiretap authorization. And although the state authorization does not cite to any specific federal statutory sections, the wiretap authorization contains numerous indications that the crimes being investigated involved the movement of stolen property across state lines. Thus, no additional judicial approval was necessary before presenting that evidence to the federal grand jury. *See United States v. Smith*, 726 F.2d 852, 865 (1st Cir. 1984). Moreover, even if it were necessary, the Third Circuit does not suppress evidence based on violations of the nondisclosure restrictions in Section 2517(5). *See United States v. Williams*, 124 F.3d 411, 427 n.11 (3d Cir. 1997).

In short, the level of detail and description in the SSI is more than adequate under the Federal Rules of Criminal Procedure and the Constitution. And Gatson's other grounds for dismissing the SSI are unconvincing. The Court will thus deny Gatson's motion to dismiss.

## B. <u>Request for a Bill of Particulars</u>

Gatson also requests that the Government provide a bill of particulars under Federal Rule of Criminal Procedure Rule 7(f). The SSI alleges that Gatson and "others" participated in a conspiracy to burglarize affluent homes in New Jersey, New York, Pennsylvania, and Virginia. It further alleges that Gatson would "transport the stolen jewelry from New Jersey to New York to be sold for cash." Gatson requests a bill of particulars (1) identifying the specific goods and jewelry allegedly stolen, (2) naming the alleged co-conspirators, (3) identifying the exact manner in which the alleged sales took place, (4) setting forth the exact means and manner in which Gatson is alleged to have transported stolen goods across state lines, and (5) specifying exactly what happened during each attempted burglary.

A bill of particulars is not an investigative or discovery tool. *United States v. Ordaz-Gallardo*, 520 F.Supp.2d 516, 521-22 (S.D.N.Y. 2007). Rather, it "is meant to apprise the defendant of the essential facts of a crime . . . ." *Id.* Thus, a court should grant a demand for a bill of particulars only if an indictment is so

5

vague that it "significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989); *United States v. Zolp*, 659 F. Supp. 692, 706 (D.N.J. 1987). "The prosecution need not particularize all of its evidence." *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). Further, a bill of particulars is not necessary where the Government has provided the defendant with extensive discovery concerning its evidence and witnesses. *United States v. Chen*, 378 F.3d 151, 162-63 (2d Cir. 2004). The decision to grant a bill of particulars rests within the "sound discretion of the district court." *Davidoff*, 845 F.2d at 1154.

Here, the SSI combined with the extensive discovery already disclosed to Gatson provides him with more than sufficient information to understand the nature of the charges against him, prepare his defenses, and avoid surprise at trial. *See* First Hafetz Decl. Ex. A. This Court will not require the Government to particularize all of its evidence. Gatson's request for a bill of particulars is therefore denied.

## C. Motion to Suppress

In his papers, Gatson asserts several grounds for suppressing evidence. First, Gatson argues that the initial communications data warrants issued in this case were based on affidavits that lacked probable cause.[1] He thus contends, based on a fruit of the poisonous tree theory, that the Court should suppress all information obtained from those warrants. Second, Gatson argues that the GPS location data for several cell phones was obtained without a warrant. Third, Gatson seeks to suppress the evidence obtained from searches of his residences on the grounds that the warrants authorizing those searches were deficient. Fourth, Gatson argues that the Court should suppress several of the items seized at the time of his arrest, because those items were not in plain view. Fifth, Gatson seeks to suppress court-authorized intercepts of cell phones used by him and his co-conspirators. Specifically, he argues that investigators failed to demonstrate the necessity of using a wiretap under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2522 ("Title III") and were not authorized to intercept and record background conversations. Sixth, Gatson claims that law enforcement officials searched his Samsung Galaxy cell phone without a warrant.

---

[1] In his Reply Brief, Gatson inexplicably contends that the BCPO seized his historical cell site location information without a warrant. Gatson Reply Br. 28, ECF No. 77. This is erroneous, as all of the historical cell site information obtained by the BCPO in this case was obtained pursuant to communications data warrants. Further, Gatson's claim is contradicted by his initial Omnibus Motion, which acknowledged that warrants were obtained the historical cell site data.

Finally, Gatson contends that "the government failed to provide a sufficient search protocol" for the searches of his electronic devices. Gatson requests an evidentiary hearing on these issues.

Gatson's request for an evidentiary hearing is denied, because he has not identified any issues of fact material to his motion. *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010) ("A motion to suppress requires an evidentiary hearing only if . . . there are disputed issues of material fact that will affect the outcome of the motion to suppress."). As discussed below, the Court finds that no Fourth Amendment violations occurred and will deny the motion to suppress.

i.  Initial Communications Data Warrants

Gatson contends that, at the outset of their investigation, state authorities improperly obtained toll billing records, including historical cell site data,[2] for two cell phones:   (1) cell phone number ***-***-3737, which is registered in the name of Nakia Henry (the "Henry Phone") and (2) cell phone number ***-***-3419, which has no registered subscriber (the "3419 Phone"). Specifically, Gatson claims that the affidavits supporting the state-authorized warrants lacked probable cause. He thus seeks to suppress not only the toll billing records for these two phones, but also all evidence that stems from those records as fruit from a poisonous tree.

Because Gatson challenges the use in federal court of state-obtained evidence, federal law applies to his evidentiary challenge. *See United States v. Rickus*, 737 F.2d 360, 363 (3d Cir. 1984) (citing *United States v. Shaffer*, 520 F.2d 1369, 1372 (3d Cir.1975)) ("It is a general rule that federal district courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law."). The Government argues that Gatson lacks standing to challenge the admission of the toll billing records. The Government further argues, alternatively, that the toll billing records were properly obtained under Section 2703(d) of the Stored Communications Act, 18 U.S.C. §§ 2701-2712. The Court agrees.

---

[2] Cell-site data provides information about the location of a phone at the time a call starts and at the time it terminates.

      1.  Gatson lacks standing to challenge the collection of the toll billing records for the Henry Phone and the 3419 Phone.

The Fourth Amendment right to be free from unreasonable searches and seizures is a personal right and a defendant must establish standing to assert that right. *See United States v. Padilla*, 508 U.S. 77, 81-82 (1993). "Fourth Amendment decisions have established beyond any doubt that the interest in deterring illegal searches does not justify the exclusion of tainted evidence at the insistence of a party who was not the victim of the challenged practices." *United States v. Payner*, 447 U.S. 727, 735 (1980); *see also Rawlings v. Kentucky*, 448 U.S. 98, 104-06 (1980). Thus, "[t]o mount a successful motion to suppress, an accused must first establish that he personally has a legitimate expectation of privacy in the object that was searched." *United States v. Stringer*, 739 F.3d 391, 396 (8th Cir. 2014).

Gatson has not established that he personally has a legitimate expectation of privacy in either the Henry Phone or the 3419 Phone. The Henry Phone was subscribed to by Nakia Henry. Gatson has no recognized privacy interest in her phone or her phone records. He is thus foreclosed from challenging the collection of the toll billing records for the Henry Phone. *See, e.g., United States v. Woodley*, No. 13-113, 2014 WL 3590143, at *11-14 (W.D. Pa. July 21, 2014) (finding that a defendant failed to establish a reasonable expectation of privacy in cell phone records including data location information where defendant proffered no evidence connecting him to the phone as its owner, subscriber, or authorized user). Similarly, Gatson has made no claim that he ever owned, possessed, used, or had any privacy interest whatsoever in the 3419 Phone. *See Stringer*, 739 F.3d at 396; *Woodley*, 2014 WL 3590143, at *12-14. And even if Gatson were to offer proof that he used the 3419 Phone, several courts have held that a defendant lacks standing to challenge cell phone records for which the defendant was not a registered subscriber. *See, e.g., United States v. Solomon*, No. 2:05CR385, 2007 WL 927960, at *3 (W.D. Pa. Mar. 26, 2007) (no expectation of privacy in cell phone records where phone was not registered in defendant's name and he was not listed as an authorized user of the phone). Further, Gatson cannot rely on the Government's intention to link him the 3419 Phone in order to establish standing. *See United States v. Serrano*, No. 13-cr-58, 2014 WL 2696569, at *7 (S.D.N.Y. June 10, 2014).

Accordingly, the Court finds that Gatson does not have standing to challenge the collection of the toll billing records for either the Henry Phone or the 3419 Phone.  The Court will thus deny Gatson's motion to suppress those records.  And because Gatson lacks standing challenge the collection of those records, his argument seeking to exclude the fruits of those records also fails.  *See Dearinger v. Rhay*, 421 F.2d 1086, 1088 (9th Cir. 1970).

> 2. The toll billing records were correctly obtained pursuant to Section 2703(d).

Further, even if Gatson were to establish standing, suppression would not be warranted.  The Third Circuit does not require a search warrant based on probable cause to obtain the toll billing records at issue here.  *See In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304, 313 (3d Cir. 2010).  Rather, the Government may obtain those records – including historical cell site data – through an order under Section 2703(d) of the Stored Communications Act.  *Id.*  Section 2703(d) requires "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation."  The affidavits relied on to obtain the records at issue easily meet the Section 2703(d) standard.

> a.  The Henry Phone

The affidavit in support of the first communications data warrant in this case, obtained in January 2013, sought toll billing records, including cell site data, for the Henry Phone from the period of November 15, 2012 through January 22, 2013.  The facts set forth in the affidavit in support of the warrant clearly demonstrated that the records were "relevant and material to an ongoing criminal investigation."

At the time of the application in January 2013, state law enforcement officers were investigating a string of residential burglaries, including burglaries consistent with the *modus operandi* ("M.O.") of the "James Bond Burglary Gang."  The affidavit described the James Bond Burglary Gang as a group of individuals, primarily residing in Teaneck and Englewood, New Jersey, who law enforcement suspected of committing approximately 700 burglaries using "a distinctive method

of operation targeting high end burglaries in affluent neighborhoods." First Hafetz Decl. Ex. C at 4.

The typical M.O., going back to the 1990s, was to operate in groups of between two and four burglars, cutting phone lines to counteract burglar alarms, forcibly opening the front door or splintering the safety glass common to sliding rear doors, ransacking the master bedroom for cash and jewelry, and using rental vehicles to travel to and from burglary locations. *Id.* at 4-5. The burglars typically favored rental vehicles for several reasons, including avoiding detection and identification by police. *Id.* at 5. The affidavit further explained that the burglars often used young females with no criminal history to rent the vehicles in their own names to evade suspicion by police and avoid direct links to the burglars themselves. *Id.*

On the evening of December 27, 2012, two burglaries occurred, one in Mahwah, New Jersey, and the other in nearby Wyckoff, New Jersey. *Id.* at 6-7. The burglaries were consistent with the M.O. described above. *Id.* In addition, the Mahwah burglary occurred on a street directly behind the Rio Vista housing development, a collection of affluent homes previously targeted numerous times by the James Bond Burglary Gang. *Id.* at 7. A canvass of the Mahwah burglary scene revealed that a white minivan was observed on a street adjacent to the burglary location. *Id.* A search of the area revealed footprints leading from the street where the white van was observed to the burglarized residence. *Id.*

Mahwah Police license plate readers – cameras that capture the license plate of vehicles traveling past them – showed that at approximately 6:46 p.m. on December 27, 2012 – the approximate time of the Mahwah burglary – a white Dodge Caravan registered to Enterprise Rental Car ("Enterprise") exited the Rio Vista Housing Development. *Id.* Enterprise records revealed that, at the time, this minivan was rented to Henry, Gatson's suspected girlfriend and known associate of Jerry Montgomery, who the affidavit explained has a lengthy criminal history, including a conviction for burglary. *Id.* at 8-9.

The affidavit laid out the extensive criminal histories of Montgomery and Gatson, including an arrest together for a home invasion in New Jersey. *Id.* at 10. The affidavit also explained that Henry had no criminal history, consistent with the James Bond Gang's practice of using females with no criminal history to rent vehicles used to commit burglaries in order to avoid detection. *Id.* at 8. Additionally, on at least one occasion during the relevant time period, one of the

10

minivans rented by Henry was parked outside the residence of Montgomery's girlfriend/fiancé/wife. *Id.* at 9.

From November 30, 2012 through January 19, 2013, Henry rented five vehicles, always a Dodge or Chrysler minivan, from various Enterprise locations in Northern New Jersey. *Id.* at 8, 12. Henry kept each minivan for approximately five to seven days before exchanging one van for another. *Id.* at 8. The total cost of Henry's rental vans over this period ran to thousands of dollars. During this same period, Henry's driver's license was suspended and she had not reported more than $47.50 in income since late 2009. *Id.* at 8-9. Henry's rental records also showed that for each rental, she provided the number of the Henry Phone as one of her contact numbers. *Id.* at 13.

The affidavit further related that on January 7, 2013, Henry returned a minivan to Enterprise, which contained, in the front of the minivan, a handwritten note with four addresses on it. *Id.* at 11. One of those addresses was in the "immediate vicinity" 11 of two attempted burglary locations, which had occurred just five days earlier in Holmdel, New Jersey. *Id.* at 11-12.

Taken together, these facts clearly established that the Henry Phone records were "relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). To the extent Gatson objects to the affidavit's discussion of Gatson's and others' criminal histories, Gatson Br. 26-27, that objection is baseless. That information can be considered when determining if there is probable cause, and thus is pertinent to Section 2703(d)'s lesser "material and relevant" standard. *See United States v. Padro*, 52 F.3d 120, 123 (6th Cir. 1995) (quoting *United States v. Wright*, 577 F.2d 378, 380 (6th Cir. 1978)).

### b. The 3419 Phone

The same reasoning and conclusion apply to the 3419 Phone Records. The affidavit for those records sought toll billing records, including cell site data, for the 3419 Phone – an unsubscribed phone that state officers believed Gatson was using to commit burglaries – for the period from November 20, 2012 through February 14, 2013. *See* First Hafetz Decl. Ex. E. Once again, the affidavit clearly established that the records sought were "relevant and material to an ongoing criminal investigation."

11

The affidavit explained that the 3419 Phone was a pre-paid phone with no discernable subscriber information and was activated on November 20, 2012, just one day after Gatson was released from the custody of the New Jersey Department of Corrections. *Id.* at 21-22. It described Gatson's criminal history, which included ten felony convictions in New Jersey, including for burglary. *Id.* at 7, 10-11. Specifically, Gatson was convicted of burglary and other charges in July 2002 stemming from a burglary at Mill Run in Paramus, New Jersey, during which the perpetrators cut the phone lines to the house and forced entry through the front door – an M.O. highly similar to that of the current burglaries the state was investigating. *Id.* at 6-7.

The affidavit also detailed the results of an analysis of Henry's phone and rental car records. Those records showed 393 calls between the Henry Phone and the 3419 Phone between November 15, 2012 and January 30, 2013. *Id.* at 21. On several occasions, the Henry Phone exchanged numerous calls with the 3419 Phone immediately before, during, and after Henry rented or returned rental vehicles to Enterprise. *Id.* at 22-24. On many such occasions, historical cell site data for the Henry Phone showed the phone in close proximity to Gatson's residence in North Bergen, New Jersey immediately before or after one of Henry's car rental transactions. *Id.*

The foregoing clearly demonstrated that the 3419 Phone Records were "relevant and material to an ongoing criminal investigation." The authorities established a clear link between the records sought for the 3419 Phone and the Henry Phone, and to Henry's repeated, suspicious rental of minivans that officers, for the reasons articulated in the affidavit, believed were potentially involved in a recent string of similar burglaries.

And once again, Gatson's objection to the use of his and other's criminal histories in the affidavit is groundless. It is well established that criminal histories are relevant to a finding of probable cause. *See, e.g., Badillo v. Stopko*, 519 F. App'x 100, 107 (3d Cir. 2013) (citing *United States v. Artez*, 389 F.3d 1106, 1114 (10th Cir. 2004)) ("[C]riminal history, combined with other factors, can support a finding of reasonable suspicion or probable cause."). It follows that such information would be valuable in making an overall determination about whether certain phone records were "relevant and material" to a criminal investigation. This is particularly so here, where the past crime was the same as the one under investigation and similarities existed between the suspect's M.O. and the current crimes. *United States v. Wagers*, 452 F.3d 534, 541 (6th Cir. 2006) (finding that a

12

prior conviction for an offense similar to the one under investigation is relevant to, though not dispositive of, a probable cause determination).

Thus, assuming Gatson did have standing, the toll billing records were properly obtained under Section 2703(d).  Finally, the Court notes that even if the affidavits were in some way deficient, suppression is not a remedy for a violation of Section 2703(d).  *United States v. Singleton*, 565 F. App'x 108, 112 (3d Cir. 2014) (citing 18 U.S.C. § 2708).  The Court will thus deny Gatson's motion to suppress the toll billing records for the Henry Phone and the 3419 Phone.

Finally, the Court notes that, in Gatson's Second Amended Pro Se Brief, it is unclear whether he challenges the collection of toll billing records for any phones besides the Henry Phone and the 3419 Phone.  To the extent that Gatson challenges the historical cell cite data for any other phones, the Court notes that all of the toll billing records obtained by the BCPO in this case were properly obtained pursuant to state-authorized warrants based on a showing of probable cause – which exceeds the federal Section 2703(d) standard for obtaining those records.

ii.  GPS Location Data

Additionally, Gatson challenges the admissibility of the "E-911" location data obtained for several cell phones in this case.  As part of its investigation, the BCPO obtained GPS location data, or "E-911" data, for three cell phones used by Gatson and one cell phone used by alleged co-conspirator Curtis Dent.  Of the three phones used by Gatson, only one was actually subscribed to by Gatson; the other two were unsubscribed phones.

Gatson claims that the BCPO obtained this GPS data without a warrant in violation of his Fourth Amendment rights.  The Court disagrees.  As explained above, Gatson lacks standing to challenge the collection of data from Dent's cell phone.  And he has asserted no facts to support standing in the two unsubscribed phones.  Finally, the local authorities obtained court-authorized communications data warrants – supported by a showing of probable cause – for all of the cell phone GPS data obtained in this case.  *See, e.g.*, Decl. of Assistant U.S. Attorney Josh Hafetz dated Nov. 13, 2014 ("Second Hafetz Decl.") Exs. B, B-1, ECF No 70.1.  Accordingly, his argument that the GPS data for his cell phone was obtained without a warrant also fails.

iii.  Evidence Obtained from Gatson's Residences

Gatson next challenges the legality of the searches of his residence on John F. Kennedy Boulevard in North Bergen, New Jersey ("Gatson's North Bergen Residence") and his residence on Chartley Lane in Stone Mountain Georgia ("Gatson's Georgia Residence").  Both searches were conducted pursuant to judicially authorized federal search warrants.  *See* Second Hafetz Decl. Exs. C, D. Gatson alleges several deficiencies in the warrants, including a lack of probable cause for the searches, a lack of particularity in the items to be seized, and a lack of "necessity" for the issuance of the warrants.  *See* Gatson Reply Br. 46-51; Pro Se Br. 28-49, 55-61.  As an initial matter, Gatson's claim that the affidavits underpinning the two search warrants at issue lacked "necessity" is meritless on its face.  While there is a necessity component when securing a Title III wiretap, a showing of necessity is not required to obtain a search warrant.  And as explained below, Gatson's other grounds for suppression also fail.

1.  The affidavits in support of the searches established probable cause.

When evaluating the propriety of a search warrant, a district court must exercise a deferential review of the issuing judge's probable cause determination. *United States v. Davis*, No. 13-00068, 2014 WL 1394304, at *5 (W.D. Pa. Apr. 9, 2014) (citing *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993)).  A reviewing court need only determine whether the magistrate or issuing judge had a substantial basis for determining that probable cause existed, based on the totality of the circumstances.  *See United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)).  This Court's review, therefore, is "quite limited," and it "must uphold a warrant so long as the issuing magistrate's determination was made consistent with the minimal substantial basis standard."  *Conley*, 4 F.3d at 1205.

When presented with an application for a search warrant, the task of the magistrate is "to make a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238; *see also United States v. Nance*, 500 F. App'x 171, 180-81 (3d Cir. 2012).  Direct evidence is not required.  *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993).  Rather, when determining whether a sufficient nexus exists to justify a search, "probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the

suspect's opportunity for concealment and normal inferences about where a criminal might hide [the contraband]." *Nance*, 500 F. App'x at 181 (citation and internal quotation marks omitted).

The Court finds that the issuing judge had a substantial basis for finding that the affidavits in support of the two search warrants established probable cause to search the residences for evidence of the crimes relating to the theft of property, including the interstate transportation of stolen property (18 U.S.C. § 2314) and the receipt of stolen property that has traveled across state lines (18 U.S.C. § 2315). The affidavits made explicit the nexus between Gatson's and his co-conspirators' suspected criminal activity, the locations to be searched, and the evidence to be seized.

### a.  Gatson's North Bergen Residence

The affidavit for Gatson's North Bergen Residence begins with a detailed overview of the approximately year-long investigation into a series of residential burglaries committed in multiple states using a similar M.O., and of the suspected interstate transportation and receipt of property stolen during those burglaries. *See* Second Hafetz Decl. Ex. C at ¶¶ 5-11.  The overview provides that during several recent burglaries, the cell phones of Gatson and his suspected co-conspirators were in close proximity to the burglary locations.  *Id.* at ¶¶ 8-10.  The overview also states that Gatson's pattern during the period of the suspected conspiracy was to travel to New York City's Diamond District shortly after the commission of a burglary in order to sell stolen property for cash.  *Id.* at ¶ 8.

The affidavit next sets forth facts supporting probable cause to search Gatson's North Bergen residence by, *inter alia*, linking Gatson to the residence and linking his residence to the criminal activity under investigation.  *Id.* at ¶¶ 12-21. These facts included physical surveillance of Gatson coming and going from the North Bergen address for months, including immediately before and after the commission of a burglary.  *Id.* at ¶ 12.  For example, the affidavit states that on or about September 24, 2013 – just over two weeks before the search warrant was issued – law enforcement officers observed two of Gatson's co-conspirators, Dent and Mark Gonzalez, arrive in the area of Gatson's North Bergen residence in Dent's car.  *Id.* at ¶ 15.  Officers then observed Dent and Gonzalez enter the building containing Gatson's residence and, not long after, observed Gatson, Dent, and Gonzalez exit the building together  *Id.*  Officers then observed Gonzalez remove a green bag from Dent's car, after which all three men left the area.  *Id.* Shortly thereafter, law enforcement officers observed Gatson, Dent, and Gonzalez

15

return to the area of Gatson's residence, whereupon Gatson entered the building containing his residence.  *Id.*  A few minutes later, officers saw Gatson reemerge, now carrying a bag.  Officers then saw Gatson, Dent, and Gonzalez drive away together in a minivan rented by Gatson.  *Id.*

The affidavit further provides that later that evening, a home in Holmdel, New Jersey was burglarized, and approximately $7,000 in jewelry was stolen.  *Id.* at 17.  The cell phones of Gatson, Dent, and Gonzalez were in close proximity to the burglarized residence at the time of the burglary.  *Id.*  Pursuant to a court-authorized wiretap, law enforcement officers intercepted a call between the cell phones of Dent and Gonzalez while the Holmdel burglary was in progress.  *Id.* The affidavit details portions of the conversation between Dent and Gonzalez as the burglary occurred.  *Id.*  During this conversation, a third voice, believed by law enforcement to be Gatson's voice, is audible from inside the burglarized residence. *Id.*

Following the Holmdel burglary on September 24, 2013, electronic surveillance showed Gatson, Dent, and Gonzalez return to the area around Gatson's North Bergen residence.  *Id.* at ¶ 19. Surveillance also showed Dent and Gonzalez enter Dent's BMW and drive away from the area.  *Id.*

The next day, on or about September 25, 2013, officers observed Gatson leave the area of his North Bergen residence and travel to New York City's Diamond District.  *Id.* at ¶ 20.  There, officers saw Gatson, carrying a bag, enter a building that houses numerous numbered kiosks where jewelry is bought and sold. *Id.*  Once inside, Gatson went directly to the A&3B Jewelry Corp. booth, which is operated by Ayman Bishay.  *Id.*  After Gatson and Bishay conversed, officers observed Gatson remove jewelry from the bag he was carrying and hand jewelry to Bishay.  *Id.*

The facts set forth in the affidavit provided the magistrate with a substantial basis for finding that probable cause existed to search Gatson's North Bergen residence for evidence related to the interstate transportation and receipt of stolen property.  The affidavit detailed an abundance of facts linking Gatson and other co-conspirators to numerous residential burglaries under investigation, linking Gatson to his North Bergen Residence, and linking Gatson and his use of that residence to the commission of the crimes under investigation.  Moreover, based on the facts contained within the affidavit – including that a voice believed to be Gatson's was heard on a wiretapped call between co-conspirators Gonzalez and Dent during the

commission of a burglary, and that Gatson and his co-conspirators were at Gatson's North Bergen residence before and after this burglary – provided substantial ground for a reasonable person to infer that the items identified for seizure in the warrant would be found inside Gatson's North Bergen Residence.

### b.  Gatson's Georgia Residence

Similar to the affidavit for the North Bergen Residence, the affidavit supporting the search of Gatson's Georgia Residence begins with a detailed overview of the approximately year-long investigation.  Contrary to Gatson's assertion that the affidavit provided "no facts explaining how the address was linked to Mr. Gatson" (Pro Se Br. 38), the affidavit provided evidence linking Gatson to the residence, including historical cell site data showing Gatson's cell phone in close proximity to the residence, numerous accounts and records in Gatson's name identifying the location as Gatson's residence, and a text message and intercepted wiretap call from Gatson's phone indicating the same.  Second Hafetz Decl. Ex. D at ¶¶ 11-14.

The affidavit next provides that on or about September 3, 2013, Gatson rented a beige GMC Yukon in Stone Mountain, Georgia.  *Id.* at ¶17.  Two days later, on or about September 5, 2013, a home in Sands Point, New York, was burglarized, with over $100,000 in property stolen.  *Id.*  The affidavit then outlines numerous facts connecting Gatson to the burglary, including (1) the presence of his and his coconspirator Dent's cell phones in close proximity to the burglary location in Sands Point, New York at the approximate time of the burglary; (2) a police vehicle stop of Gatson's rented GMC Yukon approximately one-tenth of a mile from the burglary location around the time of the burglary; and (3) the police identification of Dent as the driver of the GMC Yukon during that vehicle stop.  *Id.*

The affidavit also sets forth facts connecting Gatson to the suspected subsequent interstate transportation of property stolen during the September 5, 2013 burglary.  Specifically, the affidavit states that in the early morning of September 6, 2013, the cell phones of both Gatson and Dent were back in New Jersey, and that on September 6, 2013, Gatson's cell phone was in close proximity to New York City's Diamond District.  *Id.* at ¶¶ 17-18.

The affidavit next directly ties the crimes under investigation to Gatson's Georgia residence.  Specifically, the affidavit provides that on or about September 26, 2013, a home in Bernardsville, New Jersey was burglarized.  *Id.* at ¶ 18.

Among the property stolen was a pink gold Tank Francaise Cartier watch valued at more than $6,000. *Id.* at ¶ 18. Once again, the cell phones of Gatson and Dent were in close proximity to the burglarized residence at the approximate time of the burglary. *Id.*

The affidavit then describes an intercepted phone call between the cell phones of Gatson and an associate the next day, September 27, 2013, during which Gatson and the associate discussed what the affiant believed to be the proceeds from the Bernardsville, New Jersey burglary. *Id.* at ¶ 19.

Also on September 27, 2013, just one day after the Bernardsville burglary, Gatson flew from New York to Atlanta, Georgia. *Id.* at ¶ 20. Then, on or about September 28, 2013, while still in Georgia, Gatson called several local jewelers inquiring about the jewelers' potential interest in purchasing a Cartier watch. *Id.* The affidavit describes one such intercepted call during which Gatson asked, in sum and substance, "Do you buy Cartier watches"? *Id.* During this same call, when asked to provide his name, Gatson provided the alias "Craig." *Id.*

The Court thus finds that the magistrate had a substantial basis for finding that probable cause existed. The facts set forth in the affidavit provide overwhelming grounds for a magistrate to "make a practical, common-sense decision whether . . . there [was] a fair probability that contraband or evidence of a crime [would] be found" inside Gatson's Georgia Residence. *Jones*, 994 F.2d at 1056 (quoting *Gates*, 462 U.S. at 238).

                        2.  The search warrants stated with particularity the items to be seized.

Gatson's further argues that both search warrants failed to satisfy the Fourth Amendment's "particularity requirement." The Court disagrees. The Fourth Amendment requires all warrants to contain a "particular description" of the items to be seized. This requirement invalidates "general warrants" – or warrants that "'vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence.'" *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 149 (3d Cir. 2002) (quoting *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982)).

18

Here, contrary to Gatson's argument that the warrants simply authorized a "search for stolen property" (Pro Se Br. 60) (internal quotations omitted), both search warrants contain attachments setting forth in detail the items to be seized at each location.  *See* Second Hafetz Decl. Ex. C, Attachment B-1; Ex. D, Attachment B-1.  Both warrants described what was to be seized as "evidence, contraband, fruits, and instrumentalities" of violations of the statutes specified in the warrants themselves – the interstate transportation of stolen property and the receipt of stolen property that traveled across state lines.  *Id.*  Moreover, each warrant provided a specific, detailed list of items to be seized, which included: (1) jewelry, including watches; (2) currency and paraphernalia used to store, transport, or process currency, including safes and their contents, briefcases and plastic bags, money wrappers, rubber bands, calculators, adding machines, and money counting machines; (3) cloth bags; (4) cell phones; (5) shoes; (6) boots; (7) ski masks; (8) hooded sweatshirts; (9) dark pants; (10) gloves; and other items.  *Id.*  The warrants also authorized the seizure of certain specific types of documents and records for the limited period from November 2012 through the date of the execution of the warrant.  *Id.*

Given the specificity of items to be seized and the federal crimes for which the agents were searching for evidence, the Court finds that the warrants did not violate the Fourth Amendment's particularity requirement.  The warrants here "'described in . . . inclusive generic terms what is to be seized,'" and so "did not vest the executing officers with unbridled discretion to search for and seize whatever they wished."  *Ninety-Two Thousand*, 307 F.3d at 149 (quoting *Christine*, 687 F.2d at 753).  Further, reading each warrant "in context" and "as a whole," *Conley*, 4 F.3d at 1208, the Court finds "a sufficient nexus between the evidence to be seized and the alleged offenses,'" *United States v. Yusuf*, 461 F.3d 374, 394 (3rd Cir. 2006) (quoting *United States v. Am. Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1105-06 (3d Cir. 1989)), such that "the search warrant allows the seizure of items indicative of [the interstate transportation and receipt of stolen property]." *Conley*, 4 F.3d at 1208.

Further, the Court notes that, even if it were to find that the two search warrants at issue here were defective, the good faith exception to the exclusionary rule would apply.  *See United States v. Leon*, 468 U.S. 897, 926 (1984).  The good faith exception provides that a court should only suppress evidence "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."  *Herring v. United States*, 555 U.S. 135, 143 (2009).  Gatson has

advanced no cognizable reason for why the good faith exception would not apply here.  Further, the executing officers' reliance on the two warrants at issue was objectively reasonable.  As explained above, each warrant provided detailed descriptions of the items to be seized, and neither warrant authorized "'an exploratory rummaging.'"  *United States v. Raisley*, 466 F. App'x 125, 128 (3d Cir. 2012) (quoting *United States v. Tracey*, 597 F.3d 140, 154 (3d Cir. 2010)).  Additionally, the search warrant affidavit for each warrant was "very comprehensive, and included a host of details about the investigation, the offense, and the items to be seized."  *Id.*  Finally, each warrant was drafted and reviewed by Assistant United States Attorneys before each warrant was approved by a neutral magistrate judge in the respective judicial districts, a "review process [that] would give a 'reasonable officer . . . confidence in the validity of the warrant.'"  *Id.* at 128-29 (quoting *Tracey*, 597 F.3d at 153).  The Court will thus deny Gatson's motion to suppress the evidence obtained during the searches of his residences.

### iv.  Items Seized from Gatson's Hotel Room

On October 11, 2013, officers arrested Gatson inside a hotel room at the Marriot Hotel in Uniondale, New York.  At the time, the arresting officers had a federal warrant for Gatson's arrest.  Once officers gained entry to the hotel room, the found Gatson sitting on the bed.  The officers arrested Gatson and seized several items in the hotel room.  Gatson argues that the Court must suppress the property seized from his hotel room during his October 11, 2013 arrest.  The Government counters that each item that it intends to introduce at trial was properly seized under an exception to the Fourth Amendment warrant requirement.  The Court agrees.

The Fourth Amendment bars "unreasonable searches and seizures."  U.S. Const. amend. IV.  A warrantless search is presumptively unreasonable.  *Horton v. California*, 496 U.S. 128, 133 (1990).  However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions."  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  One exception is that a police officer can seize evidence in plain view without a warrant if certain requirements have been met.  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).  For the plain view exception to apply, the Government must show by a preponderance of the evidence that:  (1) officers were lawfully in the position from which evidence could be seen, (2) the incriminating evidence was immediately apparent, and (3) the officers had a lawful right of access to the evidence.  *See United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011) (citing *United States v.*

*Menon*, 24 F.3d 550, 559 (3d Cir. 1994)).  The second prong – that the incriminating evidence was "immediately apparent" – does not require officers to have "near certainty" that the items in plain view are contraband or evidence of a crime.  *Texas v. Brown*, 460 U.S. 730, 741 (1983).  Rather, there must be "probable cause to associate the property with criminal activity."  *Id.* at 741-42 (citing *Payton v. New York*, 445 U.S. 573, 587 (1980).

Here, the Government seeks admission at trial of the following items, which it argues were in plain view in Gatson's hotel room:  a California identification card bearing the name "Craig Streets" (the "California ID"), a paper with handwritten notes, a receipt from Jacob's Restaurant, a pair of work boots, the Samsung Galaxy cell phone, and all of the various pieces of jewelry.  The Court finds that each of these items is admissible under the plain view exception.[3]

As to the first prong, the officers were lawfully present in Gatson's hotel room pursuant to the warrant for his arrest.  *United States v. Pelletier*, 469 F.3d 194, 199 (1st Cir. 2006).  And regarding the second and third prong, the incriminating nature of each item observed in plain view was immediately apparent to the officers, and the officers had a lawful right of access to those items.  The California ID was on top of the television stand next to where Gatson was arrested. It was immediately recognizable as incriminating because it contained the name "Craig," an alias officers believed Gatson had used on several occasions when selling or attempting to sell property.  Likewise, the Samsung cell phone and the paper with handwritten notes were both located in plain view on the television stand.  The cell phone's incriminating nature was obvious; the officers believed Gatson traveled with his phone to and from burglaries and had used his phone to communicate with co-conspirators and to try to sell stolen property.  The incriminating nature of the paper was also readily apparent.  It contained a series of handwritten addresses similar in content and appearance to a handwritten note found in a rental car returned by Henry.  The officers' believed that Henry rented that car to facilitate the conspiracy.

On the same television stand, officers observed the receipt for Jacob's Restaurant.  The receipt's incriminating nature was readily apparent to the officers. The officers suspected, from an array of evidence, including wiretap intercepts and GPS location data, that Gatson and his co-conspirators had committed one or more burglaries in the hours before the officers entered the room.  Moreover, officers

---

[3] Gatson's motion mentions a jeweler's loupe, which was located in a case on a nightstand.  As the Government does not seek to introduce that item at trial, the Court has not considered its admissibility.

knew from wiretap intercepts from the previous night that Gatson intended to go to Jacob's Restaurant after he and his co-conspirators committed the suspected crimes.

The officers also had probable cause to believe that the pair of work boots observed in plain view inside the hotel room were associated with criminal activity. The officers knew that many of the burglaries Gatson was suspected of committing involved work boots. The officers were also aware that numerous police reports regarding the charged burglaries included references to boots at the crime scene.

Finally, officers properly seized the pieces of jewelry under the plain view exception. After Gatson refused to open his hotel room door for the officers, the officers began to break it open. As they did, Gatson moved in and out of the bathroom, which was located immediately to the right of the hotel door. Once the officers successfully opened the door, they entered the room. As they did, they passed the bathroom, the door to which was open. There, the officers observed a pile of jewelry clumped inside the open toilet bowl, which was facing the open doorway just a few feet inside the bathroom. As the officers continued into the hotel room, some went immediately to the bed to apprehend and secure Gatson while others conducted a security sweep of the bathroom to verify no one was hiding there.

It is well established that a security sweep incident to an arrest is lawful. *See Maryland v. Buie*, 494 U.S. 325, 334 (1990). And the plain view exception applies to evidence observed in plain view during a protective sweep. *See, e.g.*, *United States v. Blevins*, 755 F.3d 312, 325 (5th Cir. 2014); *United States v. Ruffin*, No. 13-138, 2014 WL 4060312, at *8 (W.D. Pa. Aug. 15, 2014).

Here, the protective sweep was necessary because officers saw Gatson going in and out of the bathroom and did not know if anyone else was in the room when they breached the door. The officers thus conducted a brief security sweep of the bathroom to make sure there was no one hiding inside it who might pose a threat to the officers. Additionally, the incriminating nature of the jewelry was immediately apparent to the officers. The officers knew that Gatson's arrest warrant was for a conspiracy to transport stolen property, including jewelry, interstate. And they suspected from listening to wiretaps that he had broken into one or more homes just hours earlier. The officers had also just observed, through a space in the door, Gatson walking to and from the bathroom as they attempted to gain entry to the

22

room.  Finally, the jewelry's presence in the toilet bowl strongly suggested that it was stolen property that Gatson was trying to flush before officers entered the room.  The Court will thus deny Gatson's motion to suppress the items seized from his hotel room that the Government seeks to admit.

### v. The Conversations Recorded Pursuant to the Wiretap Applications

During the investigation of this case, law enforcement officers obtained court-authorized wiretap intercepts of cell phones used by Gatson, Dent, and Gonzalez.  Gatson challenges the wiretaps on three separate grounds.  First, Gatson claims that investigators failed to demonstrate the necessity of using this law enforcement mechanism as required by Title III.  Second, Gatson claims that officers were not authorized to intercept and record background conversations that were captured during the wiretapping of various phones in this case.  Third, Gatson argues that the recording device ("car bug") placed inside the rental vehicle rented and used by him on October 10, 2013 was not authorized by a warrant and that the rental minivan in which the car bug was installed was "not located in the authorizing judge's jurisdiction."  Sec. Am. Pro Se Br. 132, ECF No. 84.  Gatson's arguments are unconvincing.

### 1. The wiretap applications satisfy Title III's necessity requirement.

A court may authorize the wiretap of a phone utilized by a member of a criminal operation if traditional investigative techniques have proven inadequate to reveal the full nature and scope of the operation.  *United States v. Becton*, 601 F.3d 588, 596 (D.C. Cir. 2010).  In Title III cases, courts have consistently held that the necessity requirement in a wiretap affidavit does not require the government to exhaust all other investigative procedures before resorting to electronic surveillance.  18 U.S.C. § 2518(1)(c); *see, e.g., United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997) (citations omitted).  "The government need only lay a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient."  *Williams*, 124 F.3d at 418 (citing *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992) (citations omitted)).  There must be a showing that "normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c).  The reviewing court may take into account affirmations based in part on the experience of a specially trained agent and should test the

government's showing using a practical and commonsense review.  *Williams*, 124
F.3d at 418 (citations omitted).

Here, the necessity of the wiretaps in this case was set forth in exhaustive
detail in the affidavits prepared by Det. Michael Falotico of the BCPO.  *See*
Second Hafetz Decl. Ex. A.  Det. Falotico articulated numerous reasons why
conventional law enforcement techniques yielded limited results in identifying the
members and scope of the conspiracy.  Det. Falotico, a law enforcement officer
trained in and assigned to the investigation of organized burglary crews, detailed
the M.O. of the "James Bond Burglary Gang," which originated in the Bergen
County area in the 1990s.  *Id.* at 8-10.  Specifically, he noted that this loose-knit
"collection of individuals" targeted high-end residences in affluent areas, operated
in teams of two to four people, utilized counter-surveillance measures to avoid law
enforcement, used rental vehicles, frequently cut exterior phone lines to deactivate
burglar alarms, and sold the stolen jewelry shortly after the crime.  *Id.* at 9-10.  As
noted in numerous pages of the affidavit, beginning around December 2012
(approximately one month after Gatson's and Dent's release from prison) and
continuing for approximately the next eleven months, several homes throughout
New Jersey were the subject of residential burglaries.

Det. Falotico noted throughout his affidavit that he and other members of his
squad performed surveillance of Gatson at his home, locations of known
associates, and hotels believed to be used as staging areas prior to criminal
activities.  This surveillance had limited results, based on the counter-surveillance
measures employed by Gatson and his associates.  *Id.* at 69-71.  The physical
surveillance "yielded little valuable information . . . other than confirming that
some of the identified members of the conspiracy" associated with one another.
*Becton*, 601 F.3d at 596.

Notably, when Det. Falotico applied for the wiretap, law enforcement had
only confirmed the identity of one other coconspirator, Dent.  It was, however,
readily apparent that others were involved in this relatively small circle of
burglars/jewelry thieves.  *See id.* (considering law enforcement infiltration of a
criminal organization through normal investigative techniques unlikely to succeed
because the defendant dealt with a small circle of street-level drug dealers).  Det.
Falotico suspected and articulated his belief that Gatson and Dent would only
"work with individuals introduced by a trusted associate."  Second Hafetz Decl.
Ex. A at 71.  Indeed, this suspicion was borne out by the fact that Gatson recruited
Dent while they were incarcerated in the same correctional facility and later

released from the same halfway house.  *Id.* at 27-28.  Thus, it is impractical for Gatson to suggest that law enforcement could introduce an undercover officer or even a confidential source into this tight group.

The futility of executing search warrants or using the grand jury process was also articulated in Det. Falotico's affidavits.  The execution of any search warrant would not only preclude further covert investigation, it would also have had limited impact in this criminal network where stolen jewelry was typically sold shortly after the crime.  *Id.* at 71-72.

Gatson's suggestion that "interviews of subjects" would somehow further the investigation is equally meritless.  Pro Se Br. 8.  At the point in time when the initial wiretap was sought, Gatson and Dent were the only clearly identified targets of the investigation.  As noted by Det. Falotico, an interview of either of these men, or compelling them to appear before a grand jury, would have eliminated the possibility of identifying other members of the conspiracy and determining the scope of the operation.  It would have also likely resulted in the destruction of evidence.  Hafetz Decl. Ex. A at 73.

Thus, the Court finds that the wiretap application came after the investigators had "engaged in an adequate range of investigative endeavors." *Becton*, 601 F.3d at 597.  Accordingly, the recorded conversations obtained from the wiretaps will not be suppressed based on a lack of necessity.

2. The background conversations were properly intercepted and recorded.

Gatson also argues that background conversations were improperly intercepted during the wiretaps.  From September 23, 2013 through October 11, 2013, the BCPO obtained judicial authorization from a New Jersey Superior Court Judge to wiretap three phones used by Gatson, one phone used by Dent and one phone used by Gonzalez.  Authorization was also granted to install a car bug in a minivan rented by Gatson on October 10, 2013.

Gatson fails to specify which of these wires containing "background conversations" should be suppressed.  He does, however, concede that these conversations were "extremely relevant to the alleged conspiracy."  Pro Se Br. 75.  The Government presumes that "Gatson seeks to suppress the background conversations and related wiretaps during several burglaries when Gonzalez, while

25

acting as a lookout inside the homes, communicated on an open line with Dent, who remained in the car as the get-away driver.  Gatson's voice figured prominently in the background of these calls as he ransacked the homes in search of cash and jewelry while communicating with his accomplices."  Gov't Br. in Opp'n to Pro Se Motions and in Surreply to Gatson's Reply Br. 36, ECF No. 82

Little case authority exists that is directly on point.  In support of his motion to suppress these background conversations, Gatson cited two cases where the investigating officers exceeded the scope of a warrant during the search of a home or physical location.  *Marron v. United States*, 275 U.S. 192 (1927); *Stanford v. Texas*, 379 U.S. 476 (1965).  Neither of these cases dealt with the proper scope of a Title III wiretap.

There is, however, persuasive authority that analogizes the plain view doctrine with a plain hearing exception as it relates to background conversations during a wiretap.  In *United States v. Baranek*, 903 F.2d 1068, 1069 (6th Cir. 1990), a district court judge entered a Title III order authorizing the interception of wire communications over a telephone located at the residence of a co-defendant. At the conclusion of an intercepted call, the co-defendant failed to replace the telephone properly in the receiver and the line remained open.  *Id.*  The phone remained off the hook for over two hours, essentially creating a phone bug in the co-defendant's home that was spot checked and recorded by the agents.  *Id.* During this time, defendant Baranek and the co-defendant engaged in "background conversations" that were captured by the wiretap.  *Id.*

The Sixth Circuit used a comparison between the long established plain view doctrine and a plain hearing exception to the exclusionary rule.  *Id.* at 1070; *see also Coolidge v. New Hampshire*, 403 U.S. 443 (1971) (holding that when police officers are in a location where they have a right to be and they inadvertently come across an item of obvious evidential value, the item is considered to be in plain view and may be seized).  The court deemed the background conversations admissible, because there was an order that made the initial intrusion lawful, the phone was left off the hook inadvertently, and it was immediately apparent to the officers that what they heard was related to a crime.  *Baranek*, 903 F.2d at 1071.

In this case, there were properly issued wiretap orders related to the phones of both Dent and Gonzalez.  The fact that Gatson's conversations with his accomplices were captured during these burglaries was certainly inadvertent.  It was also immediately apparent to the officers listening to the background (and

26

foreground) conversations that they were hearing evidence related to criminal activity.  Thus, a similar plain hearing analysis applies to this case, which involved officers acting in good faith when they intercepted conversations that were "extremely relevant to the . . . conspiracy."  Am. Pro Se Br. 75; *see also United States v. Ceballos*, 385 F.3d 1120, 1124 (7th Cir. 2004); *United States v. Ramirez*, 112 F.3d 849, 851 (7th Cir. 1997).  Indeed, in the absence of a showing of bad faith by the Government, even a technical violation of the wiretap statute will not require suppression of the evidence.  *United States v. Giordano*, 416 U.S. 505, 527 (1974) (holding that suppression is required only for a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device"); *United States v. Couser*, 732 F.2d 1207, 1209 (4th Cir. 1984) (holding the interception of background conversations, even if not permitted on the face of the wiretap order, was not a basis for suppressing the wiretap).  Accordingly, Gatson's motion to suppress the background conversations captured during the wiretaps will be denied.

> 3.   The BCPO properly obtained a court order issued by a judge with jurisdiction before installing the car bug.

Gatson argues that the BCPO recorded the conversations in his rented minivan without a warrant.  He further argues, somewhat contradictorily, that the rental minivan in which the listening device was installed was not located in the authorizing judge's jurisdiction.  The Court disagrees.

Contrary to Gatson's arguments, detectives from the BCPO obtained a court order from a Superior Court Judge in New Jersey authorizing the interception of oral communications between Gatson and his accomplices while they occupied the targeted minivan.  Furthermore, the application for that order met the requirements of Title III.  *See* 18 U.S.C. § 2518(1).  Det. Falotico identified himself as the affiant and set forth his resume, which included his training and experience in the investigation of organized burglary crews.  Gov't Letter Br. Ex. A at 2, 8-9, ECF No. 87-1.  He noted that the Bergen County Prosecutor John L. Molinelli authorized the application.  *Id.* at 8.  In multiple pages of text, the affidavit contained a full and complete statement of the facts and circumstances known to the investigators at the time of the application.  *Id*. at 8-81.  Within the caption and the first three pages of text, Det. Falotico detailed the types of crimes that Gatson and his accomplices committed and provided a description of the minivan that

would contain the car bug.  *Id.* at l-3.  The necessity of the interception and the other investigative techniques attempted were set forth in detail.  *Id.* at 86-93.  Further, the affidavit requested a twenty-day period for the interception of the communications and detailed all the other related applications.  *Id.* at 5-7.

Based on the information contained in the affidavit, the Honorable Liliana S. DeAvila-Silebi of the New Jersey Superior Court signed a seven page order on October 7, 2013.  Under this order, investigators were permitted to intercept the communications between Gatson, Dent, and others who were engaged in the conspiracy while they were inside the rental minivan.  *See* Gov't Letter Br. Ex. B, ECF No. 87-2.  The duration of the order was for 20 days.  *Id.* at 4.  Gatson's argument that the conversations recorded the car bug were obtained without a warrant is thus unfounded.

Gatson's argument that the Court should suppress the recordings from the car bug on jurisdictional grounds is also unavailing.  A plain reading of the affidavit makes clear that the investigators anticipated that Gatson would seek to rent a minivan when he returned to the New York metropolitan area in October 2013.  They sought and received permission from the rental car company to install a car bug in a minivan that would then be rented by Gatson or one of his co-conspirators.  Gov't Letter Br. Ex. A at 81-84.  While working with the rental car company's corporate security in New York, law enforcement notified the reviewing court that the minivan had been set aside "for our use to accomplish the installation here in New Jersey."  *Id.* at 85.

Moreover, after the order was signed, the car bug was installed at a location in Essex County, New Jersey.  The court order also explicitly authorizes that audio interceptions and tracking of the vehicle "shall continue even if the [vehicle] leaves the jurisdiction" of the court.  Gov't Letter Br. Ex. B at 5.  Accordingly, the Court will deny Gatson's motion to suppress the car bug recordings.

### vi.  Search of Gatson's Cell Phone

Gatson next argues that law enforcement agents illegally searched the contents of his Samsung Galaxy phone, which was seized from his hotel room during his arrest.  Specifically, Gatson argues that law enforcement officers conducted a warrantless search of the contents of that phone.  This argument is without merit, because subsequent to seizing the Samsung Galaxy and prior to searching the contents of that phone, law enforcement sought and obtained a search

warrant.  See Gov't Letter Br. Ex. A.  The Court will therefore deny Gatson's motion to suppress the evidence obtained through the search of his Samsung Galaxy phone.

vii.  Gatson's Electronic Devices

Gatson also argues that the search warrants for the searches of his electronic devices were deficient because they did not include a "sufficient search protocol." Sec. Am. Pro Se. Br. 116, 120.  Thus, he argues that those search warrants did not satisfy either the probable cause or particularity requirements of the Fourteenth Amendment.  Gatson does not articulate which search warrants were problematic or what evidence he seeks to suppress.  However, the Court assumes that he seeks to suppress the above-described Samsung Galaxy, the Sprint cell phone recovered from his residence in North Bergen, New Jersey, the Dell laptop computer recovered from the Georgia Residence, and the Samsung tablet computer recovered from the Georgia Residence.

The "search protocol" language cited by Gatson comes from a case where a magistrate judge in the District of Columbia denied the government's application to obtain a search warrant and prophylactically sought to prevent the over seizure of data by the government.  *In the Matter of the Search of Apple IPhone*, IMEI013888003738427, No. 14-278, 2014 WL 1239702 (D.D.C. Mar. 26, 2014). Conversely, Gatson attempts to suppress evidence that was obtained under search warrants that were previously reviewed and approved by federal magistrates in two different jurisdictions.

Further, the Third Circuit has previously declined to adopt any particular procedures governing the search of computers.  *United States v. Himmelreich*, 265 F. App'x 100, 103 (3d Cir. 2008) (rejecting the defense's suggestion that the court adopt a procedure requiring law enforcement authorities to provide clear techniques and limitations for searches involving computers).  Instead, the Third Circuit, like many other federal courts, has endorsed a more measured, fact-sensitive approach when evaluating the proper scope of computer-related searches. *United States v. Stabile*, 633 F.3d 219, 240-41 n.16 (3d Cir. 2011) (holding that "the plain view doctrine applies to the seizure of evidence during searches of computer files, but the exact confines of the doctrine will vary from case to case in a common-sense, fact-intensive manner"); *United States v. Richards*, 659 F.3d 527, 538-39 (6th Cir. 2011) (explaining that "the majority of federal courts have eschewed the use of a specific search protocol and, instead, have employed the

29

Fourth Amendment's bedrock principle of reasonableness on a case-by-case basis").

Here, on October 11, 2013, federal agents seized a Dell laptop computer and a Samsung tablet computer from Gatson's Georgia Residence pursuant to a validly issued warrant.  Law enforcement agents subsequently obtained a judicially authorized search warrant to search these two devices.  *See* Gov't Letter Br. Ex. C.  In the affidavit supporting that application, Special Agent Guerra noted that information obtained during the investigation indicated that Gatson had used an Instagram account to display photographs of himself with large amounts of cash and jewelry, which were quite possibly the proceeds from the specified federal offenses.  *Id.* at 3.  The affidavit also noted that during the execution of the initial search warrant of Gatson's Georgia Residence, agents recovered what appeared to be printed records of internet searches for homes in affluent neighborhoods in Georgia.  *Id.*  Thus, the agent provided a fully articulated basis to support the search of the computers.  The agent also narrowly tailored the search for evidence sought from these computers, as set forth in an Attachment A and reviewed and approved by a magistrate in Georgia.  *See id.* at Attachment A, l-3.

Additionally as described above, federal agents seized Gatson's Samsung Galaxy during his arrest on October 11, 2013.  That same day, law enforcement officers seized a Sprint cell phone from his residence in North Bergen, New Jersey, pursuant to a judicially-authorized search warrant.  Both cell phones were later searched pursuant to a validly issued warrant by a magistrate judge in New Jersey. The common affidavit supporting the search of both phones set forth the probable cause justifying the search of these phones, including references to wiretapped conversations wherein Gatson and his co-conspirators used phones in furtherance of their criminal activity.  *See* Gov't Letter Br. Ex. D.  In particular, the affidavit noted that a search of the seized cell phones might yield information regarding the identities and contact information of coconspirators as well as messages related to the specified federal offenses.  *Id.* at 10.

Thus, the Court finds that search warrants related for the searches of Gatson's electronic devices were supported by probable cause and were sufficiently particular without the inclusion of a "search protocol."  Gatson's motion to suppress those searches will be denied.

viii.   Gatson's Instagram Account

Gatson next challenges evidence obtained by law enforcement during visits to his Instagram webpages.  Gatson argues that there was no probable cause to search and seize items in his Instagram account, and he attacks as flawed the "government application" for that information.

As part of their investigation into Gatson and other co-conspirators, law enforcement officers used an undercover account to become Instagram "friends" with Gatson.  Gatson accepted the request to become friends.  As a result, law enforcement officers were able to view photos and other information Gatson posted to his Instagram account.  No search warrant is required for the consensual sharing of this type of information.[4]  *See generally U.S. v. Meregildo*, 883 F. Supp. 2d 523 (S.D.N.Y. 2012).  Gatson's motion to suppress the evidence obtained through the undercover account will be denied.

ix.   Gatson's Email Accounts

Gatson also contends that the Government's search of his email accounts on his electronic devices violated the Fourth Amendment.  The Court is once again unconvinced.

In the affidavit to search the Samsung Galaxy cell phone recovered from Gatson's hotel room and the Sprint cell phone recovered from his North Bergen residence, the Government sought permission to search email addresses and messages related to the specified federal offenses.  Gov't Letter Br. Ex. D at Attachment B1.  A federal magistrate in New Jersey reviewed the application and gave permission for the government to search for "[a]ny text messages, email messages, chats, multimedia messages installed applications, or other electronic communications."  Gov't Letter Br. Ex. D-1.  There is thus no basis to suppress the results of these searches.

Likewise, the Government sought and obtained permission to review electronic records in various forms related to both computers recovered at Gatson's residence in Georgia.  Gov't Letter Br. Ex. C at Attachment A 1-3.  A federal

---

[4] Law enforcement officers later searched Gatson's Instagram account information pursuant to the search warrants for his electronic devices.  However, the only Instagram evidence the Government seeks to introduce at trial was obtained prior to the searches of his electronic devices and was obtained through Gatson's sharing of information with law enforcement through the undercover account.

magistrate in Georgia reviewed the application and gave permission for the government to search all electronic records sought, including, but not limited to those evidencing the use of either computer "to communicate with email servers, Instagram and Twitter accounts, the Pinger application, Facebook, Inc., and other social media sites." *Id.* There is likewise no basis to suppress the results of these searches. Accordingly, Gatson's application to suppress evidence obtained from the search of his emails on the electronic devices will be denied.

## D. <u>Request for the Return of Seized Property</u>

Here, law enforcement officers seized evidence during judicially-authorized searches of a minivan rented by Gatson, and of Gatson's North Bergen and Georgia Residences. Officers also seized certain property – including allegedly stolen jewelry – during Gatson's arrest on October 11, 2013. Gatson requests "the return of seized property or, alternatively, for a hearing" on the matter. Sec. Am. Pro Se Br. 133.

The property seized is evidence for use at trial, and Gatson is not entitled to its return at this point. *United States v. Bein*, 214 F.3d 408, 411 (3d Cir. 2000) ("It is well settled that the Government may seize evidence for use in investigation and trial, but that it must return the property once the criminal proceedings have concluded, unless it is contraband or subject to forfeiture."). Moreover, to the extent any of the property seized is stolen property – i.e. contraband – Gatson is not entitled to its return at all.

Further, the SSI included a forfeiture allegation, which provided Gatson with adequate notice that the Government would seek the forfeiture of property upon his conviction for the alleged offenses. *See* Fed. R. Crim. P. 32.2(a). Gatson's argument that the Government should have included a description of the property that it is seeking for forfeiture is unavailing. Property subject to forfeiture need not be itemized or described in the indictment. *See United States v. Kahale*, 789 F. Supp. 2d 359, 377 (E.D.N.Y. 2009) (citing *United States v. Grammatikos*, 633 F.2d 1013, 1024 (2d Cir. 1980) ("[T]here is no requirement that the government individually itemize the property subject to forfeiture in an indictment.").

Gatson next argues that the Government violated 21 U.S.C. § 853(e)(1) because "the Government must seek a restraining order or injunction to preserve property subject to forfeiture." Sec. Am. Gatson Br. 133. He further argues that he is entitled to a hearing under 21 U.S.C. § 853(e)(2). Subsection 853(e) is

inapplicable, however, because the items subject to forfeiture were seized pursuant to search warrants or during Gatson's arrest.

Gatson lastly argues that his Fifth Amendment due process rights mandate a hearing.  In making this argument, Gatson relies upon *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993).  However, *James Daniel Good* only applies to real property and does not require notice and a hearing with regard to personal property.  *See Yskamp v. Drug Enforcement Admin.*, 163 F.3d 767, 774 (3d Cir. 1998) (declining to extend *James Daniel Good* to personal property).

The Government had a proper basis to seize Gatson's property pursuant to validly issued and executed search warrants.   And Gatson alleges no basis for a hearing contesting the seizure of his property.  Accordingly, Gatson's request will be denied.

## E.  Disclosure of the Entire Contents of the Wire Surveillance

Gatson seeks disclosure of the entire contents of the wire surveillance. Gatson has already received that discovery.  *See* Hafetz Decl. Ex. E at ¶¶ 1(b), 1(a) 34-37.  Accordingly, the Court will deny his request as moot.

## F.  Immediate Production of Expert Reports

Gatson requests immediate production of expert reports.  As Gatson has already received the Government's expert report, this request is denied as moot.

## G.  Motions for Discovery and Exculpatory Evidence

Gatson seeks various types of materials, including Rule 16(a)(1) material, all exculpatory evidence in the Government's possession, early disclosure of *Giglio* material, and early disclosure of *Jencks* material.  The Court will grant in part and deny in part Gatson's motions for discovery and exculpatory evidence.

Regarding Gatson's *Brady* request, this Court has discretion to determine when the Government should produce this material to Gatson. *United States v. Starusko*, 729 F.2d 256 (3d Cir. 1984).  However, Gatson must receive the material early enough to make effective use of it at trial.  *Id.*  The Court's Standing Discovery Order already requires the Government to comply with its *Brady* obligations, and the Court has received no indication that it has failed to do so.

Therefore, no further order regarding those obligations is necessary at this time. Similarly, as to the Rule 16(a)(1) material, the Government acknowledges its obligation to produce discovery under Rule 16(a)(1) and represents that it will continue to fulfill this duty. This Court has received no indication to the contrary. Thus, no order is necessary at this time.

With respect to Gatson's *Giglio* request, the Government has offered to provide that material seven days prior to the appearance of each relevant witness. However, given the potential complexity and amount of the material and that there are no countervailing security concerns that cannot be otherwise addressed, this Court will order the Government to produce *Giglio* material two weeks prior to the beginning of trial. To the extent the Government feels that certain material or certain information regarding witnesses should not be turned over because of security concerns, the Government must make specific in-camera applications to this Court explaining the need for the withholding.

As to Gatson's request for pretrial disclosure of *Jencks* material, the Government has agreed to voluntarily produce that material seven days prior to trial. His request is thus denied.

The Government need not, however, produce the following evidence requested by Gatson: (1) the evidence related to an alleged "aircard locating mission" (Am. Pro Se Br. ¶ 33); (2) "the entire investigative file maintained by D.Y.F.S. regarding Ms. Nakia Henry" (*Id.* ¶ 44); (3) the evidence related to the investigation of Jerry Montgomery, Lawrence Leevan, and Courry Rice (*Id.* ¶ 55); (4) "copies of all recorded calls made by Curtis Dent on the Hudson County Correctional Center housing unit phone(s)" (*Id.* ¶ 65); and (5) "copies of all recorded calls made by Mark Gonzalez on the Hudson County Correctional Center housing unit phone(s)" (*Id.* ¶ 66). The Government has represented that it does not know what is meant by the phrase "aircard locating mission" and is aware of no such device or evidence in this case. The Government likewise has represented that it is not in possession of the "investigative file maintained by D.Y.F.S. regarding Ms. Nakia Henry." Further, any such file is not relevant to these proceedings. The reports Gatson seeks related to the investigation of Jerry Montgomery, Lawrence Leevan, and Courry Rice are similarly not relevant to this case. Finally, the Government has represented that it is not in possession of any recorded jail calls made by Dent or Gonzalez.

### H. Disclosure of Rough Notes

Gatson requests disclosure of all rough notes and draft reports prepared by investigative agents in this case. The Court will order the Government to submit those materials to the Court three days before trial for in-camera review. *See United States v. Ammar*, 714 F.2d 238, 259 (3d Cir. 1983). The Court will then determine which, if any, of those materials the Government must provide to Gatson.

### I. Government's Witness List

Gatson seeks a list of the Government's actual or potential trial witnesses. The Third Circuit generally does not require the Government to disclose its trial witnesses, and Gatson offers no compelling justification for departing from this principle. *See Zolp*, 659 F. Supp. at 704. The Court will thus deny this request.

### J. Pretrial *James* Hearing

Gatson also moves for a pretrial *James* hearing to determine the admissibility of co-conspirator statements. *See United States v. James*, 576 F.2d 1121, 1127-32 (5th Cir. 1978). The Government argues a *James* hearing would amount to a preliminary mini-trial, which would be a waste of judicial resources and prejudicial to the Government. The Government argues that the Court should admit the co-conspirator statements subject to connection instead. The Court agrees. Under Third Circuit precedent, a district court has discretion to admit co-conspirator statements conditionally, permitting the government to prove the existence of the conspiracy and the connection of those statements to the conspiracy during the course of trial. *See, e.g.*, *United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir. 1991). This connecting-up procedure is particularly appropriate where, as here, the case involves a "large amount of interrelated testimony." *United States v. Continental Group, Inc.*, 603 F.2d 444, 456-57 (3d Cir. 1979). The Court will thus deny Gatson's request for a *James* hearing.

### K. *Starks* Hearing

Gatson next requests a pretrial *Starks* hearing regarding any recordings that the prosecution intends to use at trial. *See United States v. Starks*, 515 F.2d 112 (3d Cir. 1975). *Starks* held that "[w]hen a colorable attack is made as to a tape's authenticity and accuracy, the burden on those issues shifts to the party offering the

35

tape," who must then "prove its chain of custody." *Id.* at 122. Here, Gatson has not presented a "colorable attack" as to the authenticity of any audiotape or video tape so as to shift the burden to the Government and justify a hearing. *See United States v. Weeks*, No. 07-149-1, 2009 WL 192471, at *6 (D. Del. Jan. 26, 2009). Accordingly, the Court will deny Gatson's request for a *Starks* hearing.

### L. <u>Identity of Unindicted Co-Conspirators and Confidential Informants</u>

Gatson also requests "a list of alleged co-conspirators upon whose testimony the prosecution seeks to rely at trial," as well as a list of "confidential informants who are actually witnesses" to the crimes charged. Gatson Br. 61. The Court will deny these requests. Testifying co-conspirators and confidential informants are treated no differently than other witnesses. *See United States v. Metro. Enterprises, Inc.*, 728 F.2d 444, 451 (10th Cir. 1984); *United States v. Epps*, 982 F. Supp. 2d 564, 568 (W.D. Pa. 2013). And the Government's pretrial disclosure of *Jencks* and *Giglio* materials will identify any testifying co-conspirators and confidential informants. Further, as to any confidential informants who will not testify, "the Government has a 'privilege to withhold from disclosure the identity of persons who furnish information' regarding illegal activity." *United States v. Johnson*, 302 F.3d 139, 148-49 (3d Cir. 2002) (quoting *Roviaro v. United States*, 353 U.S. 53, 59 (1957)). A defendant may overcome this privilege by showing a specific need for disclosure – that the information will be "relevant and helpful to his defense" or "essential to a fair determination of his guilt." *Id.* at 149 (internal citations omitted). Gatson has failed to meet this burden.

### M. <u>Rule 404(b) Evidence</u>

Gatson also requests that the Government immediately disclose any evidence of other crimes, wrongs, or acts that it may seek to introduce against him under Federal Rule of Evidence 404(b). Rule 404(b) requires the Government to provide reasonable notice prior to trial of its intention to use such evidence. The Court thus orders that the Government provide Defendant with notice of its intent to introduce Rule 404(b) evidence by filing a motion *in limine* at least 21 days before trial.

### N. <u>Motion to Join Co-Defendant's Filings</u>

Finally, Gatson moves for permission to join in motions filed by his co-Defendant, Anthony Hanks.  Hanks has not filed any motions in this case, and so the Court will deny this request.

## III.   <u>Conclusion</u>

For the foregoing reasons, the Court will partially grant and partially deny Gatson's pretrial motion.  An appropriate order follows.


<u>        /s/ William J. Martini        </u>
                 **WILLIAM J. MARTINI, U.S.D.J.**

**Date: December 15, 2014**